STATE OF NEBRASKA, APPELLEE, v. T. W. BASS ET AL., APPEL-
LANTS.

FILED SEPTEMBER 25, 1936.   No. 29711.

*Perry, Van Pelt & Marti, Gaines, McLaughlin & Gaines, Hall, Cline & Williams, W. C. Fraser* and *F. P. Matthews,* for appellants.

*William H. Wright, Attorney General, Edwin Vail* and *Paul F. Good, contra.*

Heard before GOSS, C. J., GOOD, DAY, PAINE and CARTER, JJ., and BLACKLEDGE and LANDIS, District Judges.

BLACKLEDGE, District Judge.

This action was instituted in the district court for Lancaster county by the state, as plaintiff, against the defendants T. W. Bass, former state treasurer, and William C. Oelkers, his bond clerk, and the sureties upon their official bonds. It is based on the contention that Bass and Oelkers violated the conditions of their official bonds in that in the

purchase of investments by the state and settlement therefor through the office of the treasurer the defendants Bass and Oelkers permitted the brokerage concerns who sold the bonds to detach from the bonds and retain interest coupons to which they were not entitled.

The petition as originally filed contained 130 causes of action, but in the course of proceedings and before the case was reached for trial disposition was made of a number of these, so that at the time of trial there remained 111 causes of action, all of which involve transactions with Wachob, Bender & Company, as seller of the bonds. Wachob, Bender & Company was not originally a party to the action, but in its progress and on application of the other defendants, Wachob, Bender & Company was made a party defendant and brought into the action upon the theory that, if it should be determined that excessive coupons had been detached and delivered by or through the treasurer's office, Wachob, Bender & Company had received the same and consequently would be liable for an accounting therefor as between it and the other defendants if judgment should go against them.

The case was commenced as an action at law, but was subsequently transferred to the equity docket, for the purpose of aiding in the adjustment of any matters as between the defendants that might become necessary, and on the ground that the multiplicity of suits and necessarily complicated evidence made the case difficult for a jury to properly consider. The appellee, although not joining in the application for transfer of the case to the equity docket, did not in the trial court, and does not here, especially object to it, claiming that such action may or may not have been proper, and that, since plaintiff has not as yet been prejudiced in the case by such action, it raises no particular objection thereto, although desiring to maintain its attitude as plaintiff in a purely law action so far as concerns the consideration of its rights, and that the other features of the case are for consideration as between the defendants themselves in which plaintiff has no particular interest. In

view of this situation and the broad jurisdiction of the court to determine all issues as between the parties, whether legal or equitable, or both, and arrive at a final determination of the whole subject of controversy, we do not find it necessary to give further consideration to this question of practice.

There are no seriously controverted propositions of law in the case, neither is it necessary to make determination of any new propositions of law or equity. The case turns upon questions of fact, and more properly upon consideration of the weight and credibility of the evidence, to which we find it necessary to apply only well-established and familiar rules.

The difficulties arise in the complexity of the facts in which the whole situation is involved. For an understanding of these it is necessary to make, as briefly as circumstances permit, a statement of the situation which, nevertheless, must in order to fairly reflect the record be somewhat extended.

The case involves, as stated, 111 different causes of action in which the state seeks to recover various sums respectively ranging from as low in amount as $6.13 to $5,669.70, and making a total somewhat in excess of $56,000. The judgment in the trial court was for the aggregate sum of $56,338.72. The period covered by the transactions under investigation included practically all of the years 1931 and 1932, and the amount of school funds handled and disposed therein was in excess of one and one half million dollars. The trial of the case consumed 11 days of actual trial work and the record presented in this court is of three volumes in excess of 1,200 pages, so that in these days of oily butter and wilted collars with the temperature standing at 100 plus, Fahrenheit, when courts and judges are supposed to be on vacation, recuperating for the work that is to come, the court may not be entitled to many eulogies upon entering consideration of responsibility for the distribution of these thousands of interest coupons, but should consider ourselves fortunate that the case neither

alleges nor involves the loss of any part of the principal sum of nearly two millions of school funds of this state, involved in the transactions. The cause of action is to the effect that the state failed to receive some $56,000 of income which rightly belonged to it.

It is quite evident from the record before us that in his disposal of the case the trial judge spent many days in serious and laborious effort. He has made an admirable and exhaustive analysis of the facts and lucid statement of his conclusions therefrom, and, although finding ourselves unable to agree with the learned judge in some of the inferences and conclusions which he has drawn, we nevertheless desire to acknowledge the very great assistance which his labors have been to this court in its consideration of the case. He in turn, as he states, found certain agreements and assistance of the counsel for both sides of material help, for he says: "The court has found this last computation of inestimable assistance in saving an immense amount of work in checking and verifying various items." Also, "Were it not for this agreement it would be utterly impossible for this court to make any finding of amounts due with any degree of definiteness."

The board of educational lands and funds of this state, of which the treasurer was a member, is by law in charge of and responsible for the investment of the school funds of this state. Therein the financial transactions in the disposition of funds in payment for securities purchased were necessarily completed by the treasurer who had immediate charge of the funds. The powers and acts of the board were in general governed by the provisions of article VII of the Constitution, and of article 2, ch. 72, Comp. St. 1929, relating to school lands and funds. It is there provided, among other things, that the board shall consist of the governor, secretary of state, treasurer, attorney general and commissioner of public lands and buildings; that the governor shall be chairman and the commissioner of public lands and buildings secretary of the board; that they shall keep a record of all proceedings and orders made by them;

that no order shall be made except upon the concurrence of at least three members of the board; that the board shall meet on the second Tuesday of each month. It appears without contradiction that, in the purchase of these bonds for investment, they were uniformly purchased at a premium of some amount. This premium was not arrived at by the payment of a certain per cent. premium, but the bonds were purchased upon what is known as a "basis of yield." That is, a bond of, say, $1,000, carrying a rate of interest of 5 per cent. would be sold at such a premium as would make the rate of interest yield a return of 4 per cent. on the total amount paid for the bond, which in case of a $1,000 bond would require a payment of $1,250. By a course of procedure, the origin or necessity for which is not explained, the practice was adopted whereby, instead of simply buying the bonds and paying for them the principal sum plus the agreed premium so as to make the rate of yield that which was agreed upon, a check was issued by the treasurer covering the face amount of the bond only, and the premium was provided for by the detachment of interest coupons from the bonds, supposedly computed at their present worth, and then delivered to or retained by the seller as and for the premium agreed upon. It is needless to say that by such procedure it would be in very rare instances that the amount of the coupons could correspond exactly with the amount of premium to be allowed, so that in each instance there must be some balance one way or the other unaccounted for in this method of settlement. The contention is made here that in a series of transactions covering a period of time the plus would approximately balance the minus and so no injury resulted. Why it was deemed necessary, or even desirable, to do this when there was open the approved, simple and entirely accurate method of simply buying and paying for what they bought in one check is not explained. The board did not, as required by law, keep a record of the proceedings and orders made by it. The evidence discloses that out of the 111 causes of action in suit in only 16 instances did the minutes of the

board disclose the rate of yield at which bonds were supposed to be, and are herein claimed to have been, bought. In all other instances there is no record in the proceedings of the board and in many more instances there is no record in such minutes of even the purchase of the bonds or its authorization.

In reference to this situation the trial court found and states: "The evidence discloses an amazingly inefficient system of keeping records by the state board of educational lands and funds of its actions pertaining to the purchase of bonds, and the investment of school and other special funds. Also there is an astounding disclosure of the total disappearance of letters, circulars and lists of bonds that bond houses offered to sell to the state, each of which, it is claimed, contain a rate of interest basis of yield at which the seller offered to sell and on which the board acted. Three former members of that board testified that in many instances bonds were purchased by not less than three members of the board approving such offers all signing their names upon these various separate sheets, and upon that authority the treasurer made purchases and settlements, afterwards delivering the sheets to the commissioner of public lands and buildings who filed the same in his office. When bonds were thus purchased these sheets and letters constituted the only record or evidence upon this subject, as there was no record made in the minutes of the meetings of the board. It now develops that all of these separate sheets and letters have disappeared entirely from the office of the land commissioner. When and where and how is undisclosed."

Although the law fixed the times at which the board of educational lands and funds should meet and transact their business, no record was even then made of these *ad interim* purchases or their approval. It was suggested that by reason of some other meetings they found the time inadequate and so resorted to this practice in the purchase of bonds by passing slips and memoranda from one member to another and obtaining approval by means of initials and

signatures until a majority of the members of the board had been obtained. It seems that any one of even slight business experience would know that members of this board, or any similar organization, cannot lawfully transact business in that manner. It was also suggested that this was done because there were funds on hand to invest and the board was anxious to keep the funds invested as closely as possible and so could not wait the regular monthly meeting. The answer is that what they in effect did was, instead of purchasing the securities and paying for them whatever premium they agreed to pay so that the income whatever it was would be at once coming in to apply to the purpose of the fund, they hurried to get these funds into the hands of the sellers of the securities, and not only that, but to deliver to them the early maturing coupons covering a period of one or more years in accruing interest, so that instead of accelerating any benefit to the state from the fund by means of such investment, they simply paid out the money and left a vacancy during an extended period of time in which nothing in income would be coming to the fund from any source.

The state offered and there was received in evidence the minutes of the meeting of the board in so far as the same contained any reference to the authorization for the purchase of the bonds involved in these 16 causes of action.

For the rest it was undertaken to support the allegations of the plaintiff's petition by the introduction in evidence of two certain books known as bond registers which were books regularly kept in the treasurer's office in the course of business and in which was supposed to be entered the details respecting the purchase of each consignment of bonds showing a rather complete description thereof with the name of the maker, date of issue and maturity, principal amount, rate of interest, yield rate at which purchased, the face value, number and amount of coupons detached and total premium. This record was kept by defendant Oelkers, bond clerk, in the office of the treasurer.

The determination of the case turns, as it did in the trial

court, upon the weight and evidential value which ought to be given to this bond register. It is argued by the appellants that this bond register should not have been received in evidence at all, lacking as it did support by way of testimony as to its truthfulness and accuracy by the one who made it and that the making of the entries were contemporaneous with the transactions themselves. With this contention, however, we cannot agree because the record was not offered on that basis. It is to be remembered that this is a suit by the state against a former treasurer and his employee in his office, and the register being identified as a record of the office regularly kept in the course of its business and containing a record of the transactions of the office was properly admissible against the defendants responsible for its keeping as statements or admissions on their part. We think that the admission of this register in evidence was properly allowed and controlled by the holdings of this court in *Paxton v. State,* 59 Neb. 460, 81 N. W. 383; *German Nat. Bank of Hastings v. Leonard,* 40 Neb. 676, 59 N. W. 107, and *Globe Savings Bank v. National Bank of Commerce,* 64 Neb. 413, 89 N. W. 1030.

We hold that the bond register was properly received in evidence, and, it being properly received as against the principal defendants, Bass and Oelkers, it was competent evidence in the case for whatever its worth might turn out to be. It was not, however, what might properly be termed an official record. It was, perhaps, necessary and at least convenient in the transaction of the business of the office, but was not provided for by statute nor by any law given an official standing or surrounded by any presumptions which should operate to give it special weight or character. In fact, we do not understand the state to contend here that it was conclusive, for it is stated in the brief on behalf of the state that it is not contended, in view of the decision in this court in *Paxton v. State, supra,* that the bond register was absolutely conclusive in the sense that evidence to contradict it was not admissible. There was considerable testimony given at the trial for the purpose of contradict-

ing the showing, as the state contended it to be, of these entries on the bond register.

However, before considering that phase of the matter, an examination of the register itself as to the statements therein and the inferences properly to be drawn therefrom is somewhat illuminating when considered apart from any other evidence tending to support or contradict the disclosures made thereby. Having in mind the fact that these bonds were all purchased on a basis of yield different from simply the face value and rate of interest named in the bonds, the sole question for determination in this case is: What was the actual basis of yield upon which the contract of purchase was made and what is the disclosure in that regard by the bond register itself? This record to be of value should be consistent with itself. The only basis Oelkers had upon which to make a truthful entry in the column for basis of yield, or in the column for coupons detached, was the contract of purchase for the bonds and, if truthfully and correctly made, these two columns should be in agreement, which they are not. The appellants contend that the column showing coupons detached is the truthful one and corroborates their theory of the case. The state contends that this is arguing in a circle, for that, although the register shows the number of coupons detached and that such a number was excessive on the basis of yield, as shown by the other column, the entries in the coupon column do not purport to show that that was the basis of yield, but only what was done by the state treasurer. This seems to be a continued reasoning in a circle. The conclusion is inescapable that the only right basis for an entry in either column was that of the rate of yield at which the bonds were purchased. The entries in the two columns, respectively, contradict each other and there is no way to determine from the record itself which of these is correct. Resort must be had, therefore, to other evidence for the determination of that question, if it may be determined. It is argued on behalf of the state that the falsity of the record must be in the coupon column

because that would be more difficult of detection than that in the rate of yield column. It would, no doubt, require some computation to be able to make a proper comparison of one entry with the other, and yet it does not seem to be a very complicated matter to tell that upon a $2,000 ten-year bond bearing 5 per cent. and sold on a basis of yield of 4.50, $200 in coupons would be an excessive deduction and would, in fact, mean 4 per cent. instead of 4.50. However this may be and however necessary some computation was in order to determine the actual showing made by the record itself, the fact was there that the two columns each supposedly represented the same thing; and the court is asked by one side of the case to believe one column and by the adversaries to believe the other. Necessarily the evidence offered by this record would be secondary in its nature. The original, and that which should be reliable evidence, is in a very great majority of instances missing from the records of the board of educational lands and funds where it should be found; not only so, but the record upon which it is claimed the board actually acted is not only missing from its proper place, but it is claimed to have been kept by means of pencil memoranda on letters and bond lists which were passed around between the various members of the board and the treasurer's office and finally landed in a pigeon-hole in the office of the commissioner of public lands and buildings, the secretary of the board. Even they have disappeared and no one has been able to find them or account for them.

It is true that the defendant Oelkers, when confronted with the situation and condition of the record as kept by him, attempted an explanation, as to which the trial court found: "To the amazement of this court it is now sought to discredit this register by the oral testimony of the defendant Oelkers who was the bond clerk in the treasurer's office, and as such had full charge of making settlement for purchases of bonds. He now testifies that all the entries of the interest yield in the purchase of bonds involved in this case were false and do not state

the true basis of the yield; that he made the entries and knew at the time they were false and that in each instance the rate was actually 4 per cent. while the register shows from 4.15 to 4.70. It is upon this testimony that the court is now asked to discredit the bond register, and as the next best evidence to accept the carbon copies of letters of offers of sale of bonds from Wachob, Bender & Company and also that company's ledger sheets which show the interest basis of yield at which it sold the bonds."

Oelker's weird statement as to why he did this is in effect that two of the board members had told him they did not desire to buy any bonds under 4 per cent. yield; that many different bond men and bond houses were examining the records from time to time, and that he put down in the one column a higher rate of yield than the actual rate at which the bonds were purchased, thus endeavoring to mislead the bond houses and searchers of the record when they were trying to ascertain the rates at which the state was buying bonds and thus secure a better rate on bonds for the state which it might buy. Of course, such explanation is fantastic, if correct, and we do not doubt that the trial court was amazed thereby. Yet this is the witness who kept the whole record, which record is the sole reliance of the state for an affirmance of the judgment as to the majority of its causes of action.

The bond register was simply and only a bookkeeping record kept by a business office for the purpose of recording transactions proper to be noted therein and without any particular sanctions or presumptions attached by law to it. The transactions therein noted that are concerned in this case were between that office and the office of Wachob, Bender & Company, sellers of the bonds. The records of the transactions as disclosed by the books of the Wachob, Bender & Company were offered and received in evidence. They were received over the objections of the state, but we do not think such objections were well founded. The records were, of course, offered on a

different basis from that which allowed the offer of the bond register on the part of the state. The records were offered by the defendants, supported by testimony of witnesses to their truthfulness and accuracy and that they were made contemporaneously with the transactions and constituted a part of the regular records of the office in the course of its business. They were the records of the other party to the transaction and were entitled to be received and considered. The trial court, however, refused to consider them, or, rather, in its consideration of them completely discredits the letters and ledger books of the defendant, and, thereupon accepting the evidence of the minutes of the board of educational lands and funds in so far as the necessary facts were shown thereby, proceeded to compare the facts disclosed by the letters and books of Wachob, Bender & Company, and by the Marsh memorandum as against the record in the basis of yield column in the bond register and to discredit everything that did not agree with the entries contained in that column of the bond register, concluding that, because a public officer who himself keeps a record might not be allowed to later say, when to his benefit to do so, that he simply made false entries and so avoid the effect of the record, and that because in 16 instances the minutes of the board and the bond register did agree, therefore, the bond register should be held to be binding as to all the other instances and, therefore, to support a conclusion that the bond register is conclusive as to the interest basis of yield, in the absence of the minutes or other record of the action of the board of educational lands and funds.

We may agree with the trial court in its characterization of the weight or effect of the testimony of the defendant Oelkers, but we think the court clearly fell into error in giving to the record kept by that same discredited witness a force and efficacy sufficient not only to overcome evidence in opposition thereto, but in reality, as we believe, to support a judgment in favor of the state upon any consideration.

The state was bound to support its case by competent and credible evidence in order to become entitled to a favorable judgment and in this was no different from any other litigant upon the presentation of its case to the court. We have no hesitancy in reaching the conclusion from a careful study of the whole record and from the comparatively brief reference herein made to it that so far from overcoming the weight of countervailing testimony, if that were necessary, the evidence relied upon by the state, and which reduced to its ultimate means the bond register, is insufficient except when supported by other competent evidence to authorize a judgment for the state. It should be remembered that the transactions here involved cover a period of two years in time and the fact that the bond register and the minutes of the board agree in 16 instances during that time is not sufficient ground upon which to hold that the other 95 cases must by inference be bound by the same record.

The state found itself much in the situation that the prosecution does in a criminal case when its chief witness fails. There was nothing left upon which its case could stand. The fault lies primarily, of course, with the board of educational lands and funds in its failure to keep a full and accurate record of its transactions as the law requires. Had it done so, none of this controversy could have arisen, or if it did to some extent arise it would have been comparatively easy to ascertain the truth. The state must act through the agency of its officers, and when they so far fail in their duty that no proper or competent record is left from which the facts may be ascertained, the state is left to suffer the consequences of the delinquency of its officers the same as is the result with any other business institution. The result in this case is not that the defendants have been exonerated or established a clean bill of health, only to the extent that the plaintiff has not been able to prove a case against them, except as to a comparatively small portion of the state's demand. This court has made some appropriate statements respecting a some-

what similar situation and in reference to the duties of a county board and the effect of its failure to perform such duties in the opinion in the case of *Kuhl v. Pierce County,* 44 Neb. 584, 62 N. W. 1066.

It has long been a maxim in the law relating to evidence that "Whoever desires any court to give judgment as to any legal right or liability dependent on the existence or nonexistence of facts which he asserts or denies to exist, must prove that those facts do or do not exist." Jones, Evidence (2d ed.) sec. 180, quoting Stephens, Evidence, art. 93.

It also will, we believe, be recognized as elementary that, to warrant a favorable judgment, any quantum of evidence offered in support of a fact on which the court is asked to render judgment must be of sufficient weight and credibility to convince the deliberate judgment of the court that such fact does exist and that the judgment when given will speak the truth. Otherwise, the plaintiff will not have made a case entitling him to a favorable judgment and his prayer therefor must be denied.

This we believe to be the situation in the present case except as to the 16 causes of action which we find did have sufficient support in the evidence and are designated in the record of the board of educational lands and funds. These causes of action aggregate $2,969.01. As to them the judgment of the trial court will be affirmed and as to the remaining causes of action the judgment will be reversed and they dismissed. The provisions as made in the judgment of the trial court for relief to the defendants *inter se* will remain, as necessarily modified to apply to the recovery granted herein, and the cause will be remanded, with instructions to enter a judgment in accordance herewith.

AFFIRMED IN PART AND REVERSED IN PART.

CARTER, J., concurs in the result.